UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
UNITED STATES OF AMERICA,

       -against-                                              22-cr-00091 (RA)

WILLIAM DRAYTON,
                           Defendant.
------------------------------------------------------------x

## MEMORANDUM OF LAW IN AID OF SENTECNING FOR WILIAM DRAYTON

Christopher Wright
Wright Law, PC
299 Broadway
Suite 708
New York, NY 10007

I.      **Preliminary Statement**

The undersigned respectfully submits this letter in advance of William Drayton's ("William" or "Mr. Drayton") sentencing proceeding, which is scheduled for March 10, 2023, following his August 19, 2022 guilty plea, to the sole count on the Superseding Information: Conspiracy to Distribute and Possess with Intent to Distribute cocaine in violation of 21 U.S.C. §841(b)(1)(B); and fentanyl in violation of 21 U.S.C. §841(b)(1)(C).

William Drayton is a beloved son, sibling, friend, and a father to a young daughter who was born shortly before his arrest on this indictment. At the pivotal age of 31, William now finds himself on a hopeful road to redemption and the reclamation of his life. As detailed below William was born into an emotionally troubled family and has spent a great deal of his life struggling to overcome intractable challenges. He makes no excuses for his mistakes and wakes up every morning in his desolate jail cell with the crushing awareness of the gravity and consequence of his criminal conduct; conduct for which he readily accepted responsibility, pled guilty and stands ready to be sentenced.

The U.S. Probation Department ("Probation") recommends a sentence at the statutory mandatory minimum of 60 months; which is well below Probation's own U.S.S.G. calculation of Mr. Drayton's guideline range of 78 months to 97 months. *See* Presentence Report dated November 10, 2022 ("PSR") at pages 26-28 of 31 (Recommended Sentence)). The defense joins in Probation's sage sentencing recommendation and humbly requests the Court sentence Mr. Drayton to 60 months jail; a sentence that is sufficient and not greater than necessary thereby actualizing the goals set forth in 18 U.S.C. § 3553(a).

It is important to note that the Plea Agreement (dated July 26, 2022) guideline calculations differ from Probation's guideline calculations. The Plea Agreement and Probation are in accord regarding the Guideline offense level of 27. PSR ¶¶4(e), 69. The discord arises in that the Plea Agreement found William to be in Criminal History Category I (PSR ¶4(f)), whereas Probation concluded he is in Criminal History Category II (PSR ¶77).[1] Consequently, the Plea Agreement has a guideline range of 70 to 87 months (PSR ¶4(g)), whereas Probation calculates a higher range at 78 to 97 months (PSR at page 26 of 31). The defense submits this discrepancy is of no moment in that both Probation and the defense are in agreement in requesting a variance sentence of 60 months.

II.     **Legal Standard**

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the U.S.S.G guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

---

[1] This disparity arises from an apparent 2021 New Jersey misdemeanor conviction that the parties were unaware. PSR ¶¶75-77.

The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

### III.   Offense Conduct and Acceptance of Responsibility

As described in the Presentence Report ("PSR"), William was an integral figure in a conspiracy to deliver cocaine in Manhattan from 2019 until 2022. PSR ¶47.  Although William was initially described as being a "drug courier" in the conspiracy, he was in fact more substantially involved in the conspiracy acting in a supervisory capacity wherein he received drug profits and directed other individuals to engage in drug sales. PSR ¶¶46, 47.

Catastrophically, on March 17, 2021, three (3) people overdosed and died from narcotics supplied by other members of the conspiracy.  PSR ¶¶48-51. William was never charged in regard to this unquestionable tragedy and the PSR states "there is no evidence" that previous drug deliveries by William resulted in their deaths. PSR ¶¶48, 51.  Indeed, although the conspiracy led to the deaths of these three people "there is no identifiable victim relating to Drayton's conduct." PSR ¶54.

Nevertheless, William is acutely aware that his criminal conduct placed people at great risk and the tragic overdose deaths in this case graphically illustrates that peril.  He has expressed profound remorse at this loss of life and readily admits that narcotics sales are "*not* victim-less crimes."  Put simply, William did not calculate the risks attendant to the sale of narcotics and regretfully yielded to the temptation of making easy money.  William concedes that his role as simply a "drug courier" materially mischaracterizes his position in this conspiracy and he in no-way seeks to minimize his offense conduct.  He categorically accepts his designation as a supervisor in this conspiracy and more meaningfully he accepts his shameful role in our nation's existential struggle with opioid abuse.

### IV.   History and Characteristics

#### A. William's Upbringing and Family

William was born in New York City in 1991 and raised in the Fulton housing projects in the Chelsea neighborhood of Manhattan by hardworking parents who labored to instill good values and a work ethic in him despite their financial deprivations. PSR ¶¶83, 85.  William's father, William Drayton, served in the U.S. Army for 25 years as mechanic and spent his later years working for the U.S. Post Office. PSR ¶¶83, 85; Ex. A at 01.[2]

Unfortunately, William's father was a deeply troubled man who suffered from severe alcoholism, often requiring a young William to care for and attend to his father's needs.  PSR ¶85. His father's alcohol abuse frequently led to violent marital disputes with his mother, Maryann Drayton, compelling William to intervene. Id.  His father's life-long abuse of alcohol led to his

---

[2] Attached as Exhibit A are a collection of letters from William's family and friends, which are bate-stamped for ease of reference.

3

untimely death in 2009, when an 18-year-old William found his father passed out on the street in an alcohol-induced stupor. Id. The irony is not lost on William that he suffered so much pain as a child, bearing witness to his own father's horrific spiral into chemical dependency, and yet William chose to sell drugs as an adult.

William's mother, Maryann Drayton, on the other-hand has been a reliable, loving, and dependable presence throughout his life. PSR ¶83. Maryann has worked at a Walmart drug store for many years and deeply misses her son during his period of incarceration. Ex. A at 01-2. She is especially pained over the loss of contact between William and his 3-year-old daughter, TD[3]; "it brakes my heart that my son is not around for his daughter, especially he is missing out on her early life." Ex. A at 02. William's fiancée, Chrystie Ortiz (the mother of TD), echoes a similar concern regarding the separation of William from their young daughter, remarking that William "is a wonderful, loving selfless man especially with the kids… he loved being with his family as we did with him." Ex A at 03-4. Chrystie has an older son from a previous relationship, and she describes William as being a great and kind step-father to her son. Ex. A at 03-4; PSR ¶87. Chrystie relates William "was such an amazing man to my son. He helped me so much with son" attending to all of her son's mundane needs as if he was the actual father. Ex. A at 03-4.

William's aunt, Catherine Russo, writes very movingly on behalf of William describing him more like a son than a nephew and recounting a very close-knit loving family; fondly remembering William as a child "would go fishing and crabbing with his grandpa, my dad." Ex A at 05-6. Aunt Catherine is sanguine and ever hopeful about her nephew writing:

> Please allow [William] the opportunity to get his life back on track and return to his
> baby daughter [TD]. Sometimes good people make poor choices… William has a
> good heart [and] tries his best to do the right thing and do right by his family.
> Everyone deserves a second chance. I know for a fact that William will not take
> anything for granted.
> Ex. A at 05-7.

Another aunt, Phyllis Russo, states frankly that her nephew "made a bad decision" but yet she is emphatic that William is a "very nice person" and a "good dad" who would lend a hand to help those in need. Ex A at 08.

William's cousin, Samantha Gago, strikes a similarly redemptive chord describing him as "loving family member" and that he is more akin to a brother to her than simply a cousin. Ex. A at 09-10. Samantha is unwavering in her support for William detailing the yeoman's job he has done to keep his family close and attend to the needs of his new-born daughter. Id. Its apparent that Samantha has a deep admiration and love for her cousin:

> William lives his life with loyalty and respect for his family. From experience, he
> will do anything for us….. William has made mistakes in his life but he has also
> been on the path to correct them. From mending family relationships, stable jobs and
> leading family activities he has grown as a person, father and cousin.
> Ex. A at 09-10.

---

[3] Per the Court's Rules for Criminal Practice at ¶10(D),(E) the names of William's minor child and step-child will only be referred to by their initials or redacted.

The assembled letters also extol William's dogged work ethic and drive to financially support his family. Chrystie in particular details William's employment history and in particular the promise of employment as tow-truck operator. Ex. A at 3; PSR ¶106.  With his CDL driver's license William had the potential for consistent and profitable employment, something he can hopefully return to upon his eventual release from jail.  PSR ¶105.

Ultimately, the abundant love demonstrated by William's kind and generous family turned out to be bittersweet, albeit due to his regretful decision to engage in the instant offense conduct.  Paradoxically, the very people who love William the most, his family, have suffered the most as a result of his criminal conduct and subsequent incarceration.  In particular, he can no longer attend to the needs of his daughter and step-son as he had in the past.  His fiancée Chrystie recounts William's absence has upended the life of their children; forcing her to relocate their family, transfer her son to a new school and "our daughter ask[s] for her father every day and night." Ex. A at 04.

William deeply feels the betrayal, disgrace, and humiliation his behavior has caused his family as well as the incalculable harm that narcotics visit on society.  Despite his current predicament, William counts himself very lucky that he has so many good people who love him and want to help him as he struggles through life and moves on from the instant criminal case.

### B.  William's Mental Illness and Substance Abuse

When William was an adolescent he was evaluated at Bellevue Hospital in Manhattan based on a referral by his elementary school. PSR ¶95.  He does not recall the diagnosis, but he insists he struggled with depression and anxiety throughout his childhood with little to no treatment.  William eventually dropped out of school at a very young age in the 9th grade and has never returned to school. PSR ¶104.  William intends to avail himself of mental health treatment once his sentence concludes.

As is the case with all too many people, William has sought to self-medicate his mental illness by abusing narcotics and alcohol.  William started heavy drinking around age 26 and would especially drink during the weekends continuously up until his arrest, describing this long period of binge drinking as "very bad." PSR ¶97.  His consumption of marijuana increased significantly during this period causing strife in his relationship with Chrystie. PSR ¶87, 98.  William first used cocaine in his twenties, and it quickly became an addiction where he continuously abused cocaine on weekends up until his arrest in this case.  PSR ¶100.

William is committed to entering substance abuse treatment once he is transferred out of MDC and is acutely aware that he will have to lead a sober life once he is ultimately released from prison. Notably, William's involvement with the instant criminal conduct coincided with his heaviest abuse of cocaine and alcohol.

### V.    Conditions of Confinement

William has been incarcerated at the MDC since February 2, 2022 (PSR Page 2 of 31), enduring unusually harsh conditions of confinement during the COVID-19 pandemic. The world-wide COIVD-19 pandemic is unquestionably beyond anything contemplated by drafters of the Sentencing Guidelines. Conceptually, the notion of a "just punishment" was never meant to include

5

serving a prison sentence in the midst of a global pandemic. This case marks the first time William has ever been incarcerated so it has proven that much more difficult for him to endure this dreadful experience.

There is no need to reiterate the staggering facts and statistics that have inundated the Courts regarding the spread and lethality of the disease. For the public at large, the threat has proven more than theoretical. That threat, however, is magnified for those in custody. Since March 2020, the MDC jail has been in various states of lockdown, with limited time to shower, unable to make legal or personal calls, etc. William confirmed wretched and brutal conditions of confinement while at the MDC jail, often going many days confined to his jail cell unable to shower or attend to basic needs. Particularly harsh was the near total isolation suffering through long periods of time with little to no communications with his family.

Significantly, William has incredible sympathy for the Bureau of Prisons ("BOP") jail staff as they often stumbled blindly along doing an impossible job at containing an unimaginable viral pandemic. He reports that conditions have improved since he first arrived at the MDC jail last year, and he has witnessed the BOP make significant strides in trying to contain the COVID-19 virus. Nevertheless, he is brought to tears when discussing the interminable periods of total isolation at the MDC jail through the worst of the crisis.

Time spent under such intense emotional strain simply cannot be equated with the anticipated punishment represented in the sentencing guidelines. It would be unjust to discount this reality. Reduced to its essence, we respectfully submit that each month served in the MDC jail during this pandemic is "worth more" when considering the requirement of just punishment than a month spent under more "normal" circumstances.

In *U.S. v. Aracena De Jesus,* Judge Englemayer granted a substantial downward variance to a defendant in recognition of the harsh conditions of confinement:

> Finally, I am mindful … that you have served your time in prison so far during the worst pandemic in this country during the past 100 years . . . Bottom line your time at MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you have experienced since your arrest [].

*U.S. v. De Jesus*, 20-CR-19 (PAE) (July 1, 2020 Sentencing Transcript) ECF No. 27.

Other Judges within this district have imposed reduced sentences based on the Covid-19 pandemic and the resultant harsh pretrial conditions of confinement. *See e.g. U.S. v. Morgan* 19-CR-209 (RMB) (S.D.N.Y. May 5, 2020) (reduced sentence in part based on the pandemic conditions, 15 month sentence where guideline range was 41 to 51 months); *U.S. v. Pierson*, 14-CR- 855 (LTS) (S.N.D.Y. May 4, 2020) (same rationale, time served sentence for violation of supervised release); *U.S. v Casillas* 19-CR-863 (VSB) (SDNY May 4, 2020) (same rationale, time served sentence where guideline range was 15 to 21 months). We respectfully submit that the challenging conditions of confinement at the MDC jail during the COVID-19 pandemic is a factor the Court may consider when determining how much additional punishment is necessary for William.

It is of great significance to note that William has been a model inmate during his year of incarceration at the MDC jail. He has abided by all prison rules and sustained zero disciplinary sanctions. PSR ¶6. Important as well, William has availed himself of as many classes and education programs provided at MDC jail; compiling 77 hours of educational programs in over 12 different courses. PSR ¶6. An especially impressive accomplishment as COVID-19 has forced the MDC jail to scale back many educational programs.

## VI.  Conclusion

.         As mentioned at the outset of this memorandum, we respectfully request the Court impose the sentence as recommended by the U.S. Probation Department which is the statutory mandatory minimum of 60 months; a sentence that appropriately reflects all of the critical 18 U.S.C. 3553(a) factors.

First, William has continued to show remorse and reflect on how his criminal conduct affected society, drug abusers, his family and his infant daughter in particular; and a sentence of 60 months will undoubtedly serve as a deterrent against any future recidivism. William has confided that the last year at MDC has been deeply impactful upon him and is unyielding in his desire to turn his life around and never return to jail.

Second, William's difficult childhood and deeply troubled family life is an obvious factor that should be considered in determining an appropriate sentence. The PSR and attached letters all corroborate his difficult upbringing. Courts will often consider how adverse socio-economic conditions affect defendants and their relationship to the criminal justice system. *See U.S. v. Bannister*, 786 F. Supp. 617 (EDNY 2011). By any measure, William grew up in a chaotic and neglected environment dominated by an alcoholic father and marked by domestic violence. William's struggle with depression and anxiety most assuredly contributed to his adulthood substance abuse.

Third, William's drug abuse and mental health is another basis for the requested sentence. Sentencing courts are mandated to consider the need to provide medical care for defendants and William's substance abuse and long struggle with depression certainly qualify. As discussed in his PSR report William has abused alcohol, marijuana, and cocaine for many years. William would greatly benefit from mental health treatment and substance abuse counseling during his incarceration. William acknowledges that his substance abuse has contributed to his poor decision making and he readily accepts that alcohol, marijuana, and cocaine were awful ways to "treat" his depression. To that end we respectfully request the Court consider his need and desire to receive treatment for his drug abuse and his underlying struggle with depression.

Fourth, it is also relevant that William has been incarcerated at the MDC for over 1 year during the horrid COVID-19 conditions of confinement discussed above. Those conditions may be considered when meting out an appropriate sentence. *See e.g. U.S. v. Carty* 2654 F.3d 191 196 (2d Cir. 2001) (presentence confinement conditions may in appropriate cases be a permissible basis for a lesser sentence); *see also* cases cited *supra*.

As a final thought, the attached character letters demonstrate that William is clearly a complex man who has struggled mightily against debilitating traumas; and yet William endures and is

7

fortunate to have a loving family ready to embrace him with open arms and support him upon his eventual release from jail.  William is not beyond redemption, rather he is a young man filled with an abundance of compelling qualities that speak to his hope and his good character.  William's "goodness" is a consistent theme found in each of the submitted letters, which speaks to his essential decency.

      We respectfully request the Court sentence William to the mandatory minimum of 60 months of imprisonment in accord with Probation's recommendation. Although William endured trauma as a child and has spent much of his adult life struggling with drug abuse and depression he makes no excuses for his criminal conduct. He accepts full responsibility for the instant offense without any qualifications. William's everlasting hope is that this painful experience will afford him the chance to embrace sobriety and be a positive role model in the life of his young daughter.

                                            Sincerely,

                                            Christopher Wright
                                            Counsel for William Drayton