

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 3, 2023

**BY ECF**

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:     *United States v. William Drayton*, S1 22 Cr. 91 (RA)

Dear Judge Abrams:

The Government respectfully submits this letter in advance of the sentencing of defendant William Drayton.  For the reasons explained below, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 70 to 87 months' imprisonment, as set forth in the plea agreement, would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I.  Background

### A.  Factual Background

This case arose from an investigation into the fentanyl-poisoning deaths of Julia Ghahramani, Amanda Scher, and Ross Mtangi, on or about March 17, 2021. The investigation identified the defendant as a participant and mid-level supervisor in a long-running narcotics delivery service conspiracy.  Co-defendant Kaylen Rainey was also a participant in the conspiracy and operated as a "runner" who delivered drugs to customers on behalf of the conspiracy in return for a small fee.  Co-defendant Billy Ortega was the leader of the conspiracy.  Co-defendant Josefina Marine, Ortega's mother, operated the stash house where the conspiracy members stored their drugs, money, and guns.

#### 1.  The Three Fatal Fentanyl-Poisonings

On March 18, 2021, New York City Police Department ("NYPD") officers and emergency medical personnel were called, separately, to Ghahramani's and Scher's Manhattan apartments and to a Manhattan hotel room where Mtangi was staying.  (November 10, 2022 Final Presentence Investigation Report ¶¶ 10-25).  All three victims were found unresponsive and pronounced dead on the scene.  (*Id.*)  Responding officers found translucent black baggies containing a white powdery substance at all three locations.  (*Id.*)  The white powdery substance in the recovered baggies at the scenes tested positive for the presence of fentanyl.  (*See id.*; *see also* Government Exhibits ("GX") 804, 808, 810 (lab reports admitted during the trial of Billy

Ortega)[1]).  Certified forensic toxicologists from the Office of the Chief Medical Examiner of the City of New York ("OCME") assessed biological specimens from each of the victims and determined that Scher and Mtangi's contained fentanyl and Ghahramani's contained fentanyl and acetylfentanyl (a fentanyl analog that is often "mixed in with fentanyl" as a "contaminant or part of the process of making" fentanyl).  (Trial Transcript from the trial of Billy Ortega ("Tr.") 484; GX 801, 802, 803).  Consistent with those results, the Government's medical toxicology expert Dr. Stacey Hail opined that Ghahramani would not have died but for fentanyl and acetylfentanyl and that Scher and Mtangi would not have died but for fentanyl.  (Tr. 475).

Law enforcement reviewed Scher's and Ghahramani's cellphones and on several occasions, including on the day before their deaths, they communicated via text with the user of the telephone number 646-421-5555 (the "5555 Drug Dispatcher Phone") regarding drug deliveries. (PSR ¶¶ 26-32).  The Government's investigation identified co-defendant Billy Ortega as the user of the 5555 Drug Dispatcher Phone and the leader of the conspiracy. (PSR ¶¶ 33-39).  Toll records show that the 5555 Drug Dispatcher Phone called and texted Scher and Ghahramani after their drugs were delivered.  One of the texts to Scher told her: "try not to do too much because it's really strong."  (PSR ¶ 31).  In addition to texting the victims after the drugs were delivered, the 5555 Drug Dispatcher Phone also made several calls to Scher and to Ghahramani but neither victim ever responded to the continued texts/calls from Ortega.  (PSR ¶ 32).

As shown in toll records for the 5555 Drug Dispatcher Phone, after Ortega made several attempted calls to Scher and Ghahramani—with the last attempted call occurring at approximately 12:26 p.m.—the next call that Ortega made was to 551-248-2481, used by Drayton (the "Drayton 2481 Phone"),[2] at approximately 1:45 p.m., and Ortega and Drayton exchanged additional relatively short calls over the course of that day.  (PSR ¶ 45(a)(ii)).

**2.  Drayton's role**

Drayton acted as a courier or "runner" for Ortega's drug delivery service, and also served in a mid-level supervisory role under Ortega.  (PSR ¶¶ 47-49; *see also* Dkt. 143 at 3 (Drayton's sentencing submission admitting that Drayton "was in fact more substantially involved in the conspiracy acting in a supervisory capacity wherein he received drug profits and directed other

---

[1] The Court can, and should, rely on the trial evidence from co-defendant Billy Ortega's trial in sentencing Drayton. *See, e.g.*, *United States v. Cacace*, 796 F.3d 176, 190-91 (2d Cir. 2015) ("[A] a sentencing court is entitled to rely on any type of information known to it, even information gleaned from a trial in which the person to be sentenced was neither a defendant nor represented by counsel.")

[2] Drayton's cellphone was seized at his arrest, and his SIM card shows that the assigned number is 551-248-2481.  Aside from the SIM card, the Government has not been able to access the contents of Drayton's cellphone.

individuals to engage in drug sales")).  This supervisory role was corroborated by text messages, including from co-defendant Rainey's phone (the "Rainey 4039 Phone").

### a. Messages Between Drayton and Rainey

Messages between the Rainey 5039 Phone and the Drayton 2481 Phone contain further evidence that the defendants were trafficking narcotics, including that Drayton appeared to maintain drugs at his Manhattan residence (while also at times residing in New Jersey, like Ortega) and supplied drugs to Rainey, including by using his mother as an intermediary.[3]

For example, on or about August 3, 2021, the following exchange occurred:

> Drayton 2481 Phone:  Yo I am stepping out but I need you to pick up something from my house
>
> Rainey 5039 Phone:  I'm coming up
>
> Drayton 2481 Phone:  Yo she gave you the wrong stuff
> Where are you
> Yo
> Before you drop shit off
> Answer
> Yo
> Wtf
> So u don't see me calling or texting
>
> Rainey 5039 Phone:  N[***] idgaf about nobody calling or texting me you ain't nobody i have to answer too first of all
> Whatever she messed up gone have to wait a minute anyways

Indeed, like Ortega's mother co-defendant Marine, Drayton and his mother also had an apartment in the Fulton Houses, nearby where Rainey was living at the Fulton Houses in Marine's apartment. Thus when Rainey says "I'm coming up," he is going to Drayton's apartment in the Fulton Houses, and the "she" refers to Drayton's mother.

As another example, on or about May 18, 2021, the following exchange occurred:

> Drayton 2481 Phone:  Yo I am in my moms

---

[3] On numerous police reports, Drayton provided his address as an apartment on the 21st floor of 418 West 17th Street, New York, New York—in the Fulton Houses, a New York City public housing complex.  Drayton's mother also lives at that address.

> I need you to get a zip car for the day
> I need you to bring any work you have left and bring the chicken over also
> ASAP
> Did you get my tex

Rainey 5039 Phone:    Listen if you need something that bad you come get it yourself. I keep telling y'all I AM NOT ON NOBODY TIME BUT MY OWN! I have my own business to handle that i actually get paid for. Don't fucking do that shit!!

In the above text Drayton's exchange, Drayton referred to a Zipcar (a type of rental car that the delivery conspiracy regularly used, often referring to it as a "zip"), narcotics ("work") and money ("chicken").

## b. Messages Between Rainey and Ortega Regarding Drayton

Similarly, messages between Rainey and Ortega show further instances where Drayton supplied Rainey with narcotics, and Rainey passed narcotics proceeds to Drayton. As the Court is aware from trial, Ortega used a variety of cellphones to communicate with Rainey, including: 646-421-5555 ("Ortega 5555 Phone"),[4] 646-853-6897 ("Ortega 6897 Phone"),[5] 646-945-5367 ("Ortega 5367 Phone"),[6] and 646-530-4115 ("Ortega 4115 Phone").[7] Moreover, Drayton was referred to, at times, as "daddy" or "lover boy" in these messages—also used or suggested in messages between Drayton and Rainey as referring to Drayton.[8]

---

[4] 646-421-5555 is referred to above and in the Complaint as the 5555 Drug Dispatcher Phone.

[5] 646-853-6897 is the "day phone" listed on Ortega's kingbilly0812 iCloud account described in the Complaint.

[6] The Ortega 5367 Phone messages the Rainey 5039 Phone for the first time on or about March 19, 2021—that is, shortly after the three overdose deaths. When the Rainey 5039 Phone asked the Ortega 5367 Phone "Who is this?", the Ortega 5367 Phone responded: "Billz".

[7] 646-530-4115 is the number assigned to a cellphone seized from Ortega's residence at his arrest.

[8] For example, on or about November 30, 2018, the Rainey 5039 Phone wrote to the Drayton 2481 Phone: "GoodMorning daddy". As another example, on August 17, 2020, the Drayton 2481 Phone wrote to the Rainey 5039 Phone: "Yes cuz I am daddy I am boss".

While "lover boy" does not appear in the messages Rainey and Drayton, there are messages suggestive of a playful or flirtatious relationship. For example, on or about November 5, 2018, the Rainey 5039 Phone wrote to the Drayton 2481 Phone: "Smh clearly you cheating cuz idk where you been at. Still no call or nothing and i told you i need to go to the store". As another example,

*First*, Rainey appears to have been supplied at times by Drayton, who maintained narcotics in his Fulton Houses residence, as indicated in the following text message examples.

On or about October 17, 2020, the Ortega 5555 Phone and the Rainey 5039 Phone have the following exchange regarding drug deliveries and obtaining additional narcotics from Drayton's apartment in the Fulton Houses:

| | |
|---|---|
| Ortega 5555 Phone: | [street number] W 37, 6K 2will 300$ |
| | [street number] Bleecker Street, 1will 200$ |
| | [street number] 6th Ave Ny 1will 200$ |
| | [street number] 11th ave 1will 200$ |
| | [street number] East 82 st 1m 1will 300$ |
| | |
| Rainey 5039 Phone: | I only have 5 will left |
| | I'm going over there |
| | What floor he on again? |
| | |
| Ortega 5555 Phone: | 21 |
| | |
| Rainey 5039 Phone: | I'm coming up |
| | He coming out or his mom? |
| | |
| Ortega 5555 Phone: | Mom |
| | |
| Rainey 5039: | I'm here |
| | |
| Ortega 5555 Phone: | Cool he's calling her |
| | Let me know when she comes out |

In the first message, Ortega sent Rainey information for five deliveries, one delivery per line: an address, followed by the ordered amount of narcotics (e.g., "2will" or "1m"), followed by the price to be paid. Rainey responded he does not have enough cocaine or "will". Rainey then stated that he is going to Drayton's apartment in the Fulton Houses, which, as noted above in footnote 3, is located on the 21st floor (Rainey: "What floor he on again?" Ortega: "21"). The messages further indicate that Drayton used his mother to assist in the narcotics conspiracy.

On or about May 24, 2021, the Ortega 4115 Phone texted the Rainey 5039 Phone that Ortega has a client, and the following exchange occurs:

| | |
|---|---|
| Rainey 5039 Phone: | Copy |
| | Im going up to wills now |

---

on or about November 22, 2018, the Rainey 5039 Phone wrote to the Drayton 2481 Phone: "You don't love me anymore."

> Ortega 4115 Phone:    Cool
>
> Rainey 5039 Phone:    Im
>                       Knocking
>                       No answer
>
> Ortega 4115 Phone:    He's coming to the door now

In this exchange, Rainey indicated that he was going up to Drayton's residence, where Rainey would obtain drugs for delivery to the client.

On or about May 31, 2021, the Ortega 4115 Phone has the following exchange with the Rainey 5039 Phone:

> Ortega 4115:    [street number] W. 20th St. 1red and 1q 500$
>
> Rainey 5039:    Ok
>
> Ortega 4115:    Yo
>                 Happen with the client
>
> Rainey 5039:    Waiting for Will to give me the Q

Here, again, Drayton ("Will") provided Rainey with the drugs ("1q" and "the Q") that Rainey obtained from Drayton and then delivering to a customer ("client").

On or about May 17, 2021, the Ortega 5367 Phone messaged (via WhatsApp) the Rainey 5039 Phone: "hey go see your lover.. then [street number] Warren st 2k give him 6 red and 1 black 2k." Here, again, "your lover" refers to Drayton, that "6 red" and "1 black" refers to narcotics that Rainey was obtaining from Drayton and then delivering, and that "2k" refers to a $2,000 payment by the customer.

On or about June 8, 2021, the Ortega 4115 Phone texted the Rainey 5039 Phone: "Hey in 5min 450 1red 300$ [/] Then run up to lover boy .. after that [/] [street number] 9ave 10 es 200$". In this message, "lover boy" refers to Drayton, from whom it appears Rainey will obtain narcotics ("10 es," or 10 ecstasy pills) for delivery.

*Second*, Ortega appears to have directed Rainey to pass larger sums of drug money to Drayton.

On or about December 16, 2020, the Rainey 5039 Phone messaged (via WhatsApp) the Ortega 6897 Phone in part that he had "1845," meaning $1,845 in narcotics proceeds. Ortega responded: "Cool bro thank you .. hey pass your daddy 975 out of the 1845." Ortega then instructed Rainey to provide over half of the narcotics proceeds to Drayton.

In a text exchange on or about March 7 to March 8, 2021, Ortega directed Rainey to pass profits to Drayton:

Ortega 4115 Phone:     Hey did she send you 1k

Rainey 5039 Phone:     Yeah

Ortega 4115 Phone:     Hey boss Total for the zip [car]

Rainey 5039 Phone:     $160

Ortega 4115 Phone:     Cool take 160 for zip and 100 for you bro
                       And the 740 pass it to your daddy

Here, "your daddy" refers to Drayton, the recipient of the full $740 in profits after paying for a Zipcar ("160 for zip") and Rainey's delivery services ("100 for you").

Similarly, on or about May 18, 2021, the Rainey 5039 Phone texted the Ortega 4115 Phone: "100 Sunday [/] 1870 yesterday".  The Ortega 4115 Phone responded "Thanks pa pass it to lover boy".

On or about May 25, 2021, the Ortega 4115 Phone and the Rainey 5039 Phone discussed another payment, in the below exchange.  While Ortega instructed Rainey to hold the money,[9] the exchange provides further evidence that "daddy" is "[W]ill"—that is, William Drayton.

Ortega 4115:     Thanks bro They sending another 3K now to you
                 Hold it I'll be out there in a few hey do you want to get a zip and pic
                 me up
                 [gif]

Rainey 5039:     [gif]

Ortega 4115:     Come on you can do it

Rainey 5039:     Lol im out and about for a bit
                 Tell daddy lol
                 Knocking
                 No answer

Ortega 4115:     Ok cool can you get him the zip then ? lol

---

[9] Notably, Rainey appears to have assumed that the recipient would be Drayton.  On or about May 29, 2021, the Rainey 5039 Phone asked the Ortega 4115 Phone: "Al [Am] i giving daddy the 3k?" and the Ortega 4115 Phone responded, "Hold it."

| Rainey 5039: | Lmao |
| | For when? |

| Ortega 4115: | Hey |
| | For now So the whole day |

| Rainey 5039: | I'll check for something |

| Ortega 4115: | [gif] |
| | Hey whats the word |

| Rainey 5039: | Im not around to give will the card |

Here, Rainey and Ortega were discussing a Zipcar ("zip") that could be used to pick up Ortega. Rainey told Ortega to have Drayton ("daddy") pick up Ortega instead. Rainey thereafter said he is not available to pass the Zipcard (i.e., the card used to rent Zipcars) to Drayton ("Im not around to give will the card").

### c. Events on March 17, 2021

During Ortega's trial, the Court received evidence that it was Drayton, not Rainey, who was supposed to deliver drugs for Ortega on March 17, 2021—the day that Rainey delivered Ortega's drugs that killed the three Victims. However, Drayton and Ortega got into a dispute because Drayton did not want to do one of the deliveries:

| Drayton: | See if this n[***] wanna work I am not taking no train |

| Ortega: | Smh [shake my head] |

| Drayton: | Did u call him |

| Ortega: | Take the month |

(GX 101-17, at 919-20). Right after that Ortega contact Rainey, who agreed to work in Drayton's place on March 17, 2021. Had Drayton worked that day, he would have delivered the fatal doses that killed the three victims. Indeed, Drayton had previously delivered cocaine to at least Scher and Ghahramani on other occasions. (*See* PSR ¶ 45).

## B. Procedural Background

On February 1, 2022, Drayton was arrested pursuant to a criminal complaint (the "Complaint") charging him with narcotics conspiracy, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(C). On February 10, 2022, the grand jury sitting in this District returned indictment 22 Cr. 91 (RA) charging Drayton with the same offense. Drayton was not charged with distributing the drugs that caused the three victims' deaths.

On August 19, 2022, waived indictment by a grand jury, and Drayton pleaded guilty, pursuant to a plea agreement, to Superseding Information S1 22 Cr. 91 (RA) ("the Information"), which charged him with narcotics conspiracy, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(B).

The PSR calculates a Guidelines range of 78 to 97 months' imprisonment, [10] and recommends a sentence of 60 months' imprisonment, which is the minimum required by statute. (PSR at 26-27). The defendant requests a sentence of 60 months' imprisonment. (Dkt. 143, at 2).

## II. Discussion

### A. Section 3553(a) and the Guidelines

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed—

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established [in the Guidelines];

---

[10] The PSR's calculation differs from the calculation in the plea agreement with respect to criminal history. Based on a 2021 New Jersey misdemeanor, the PSR found Drayton to be in Criminal History Category II, rather than Criminal History Category I, as in the plea agreement. (PSR ¶¶ 4(f), 75-77).

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### B.   The Court Should Impose a Guidelines Sentence

A sentence within Stipulated Guidelines Range would be sufficient, but not greater than necessary, to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; and to deter future criminal conduct of this defendant and others tempted to sell deadly narcotics in the community.

The defendant held a mid-level supervisory role in the narcotics delivery service, and did so for a long period of time.  He also was entrusted, at times, to provide cocaine and other drugs to other runners (like Rainey), utilizing his mother's apartment in the Fulton Houses to store the drugs and the proceeds—just like Ortega, the leader of the conspiracy, used his mother's apartment to store drugs and money as well.  Drayton also acted as a runner himself, delivering primarily cocaine to customers for a significant period of time—including, at times, to at least two of the Victims.  In short, the defendant played an important role in the narcotics delivery service, conspiring to distribute large amounts of cocaine into the New York City community.

While cocaine is not nearly as deadly as fentanyl—the substance that killed the three Victims—it is nevertheless a highly addictive substance that destroys lives, destabilizes communities, and funds criminal organizations like Ortega's delivery service.  Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures, respiratory failure, organ damage, and, at times, even death.  *See* National Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), *available at* https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.  Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. *See, e.g.*, *United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing

study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

The harms posed by cocaine have only increased over time.  Empirical data shows, for example, that while fentanyl poisonings are clearly the top killer among controlled substances, the total number of deaths from drug poisonings involving cocaine have also increased dramatically over the last two decades:



Figure 21. Total Number of Deaths from Drug Poisoning Involving Cocaine in the United States and the District of Columbia, 2010 – 2018

Drug Enforcement Administration, 2020 National Drug Threat Assessment (Mar. 2021), at 30, available at https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

A sentence within the Guidelines Range is necessary to promote general deterrence. Recidivism data compiled by the United States Sentencing Commission shows that rearrest rates among federal drug offenders are very high and that longer sentences generally correlate with lower recidivism:



Figure 18.  Rearrest Rates by Length of Imprisonment and Criminal History Category for Federal Drug Trafficking Offenders Released in 2010

United States Sentencing Commission, Recidivism of Federal Drug Trafficking Offenders
Released in 2010 (Jan. 12, 2022), at 37, *available at* https://www.ussc.gov/sites/default/files/pdf/
research-and-publications/research-publications/2022/20220112_Recidivism-Drugs.pdf.  Even if
the defendant himself is in a lower recidivism category than those with greater criminal history,[11]
the data make clear that substantial sentences are necessary to achieve meaningful deterrent
impact.

Lastly, drug crimes are lucrative—indeed, Ortega charged $100 per gram of cocaine, an
extraordinary markup—and the number of individuals willing to engage in such crimes for profit
is much too high.  A Guidelines sentence is therefore warranted to deter others who would be
tempted to enter into the drug trade.

## III.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose
a sentence within the Stipulated Guidelines Range of 70 to 87 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:  _____/s/_____
Micah F. Fergenson / Michael R. Herman
Assistant United States Attorneys
(212) 637-2190 / -2221

Cc:  Christopher Wright, Esq. (By ECF)

---

[11]   Probation has found that the defendant is in Criminal History Category II, but as discussed,
Drayton engaged in the offense conduct for a long period of time before being caught.